UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM CAMPBELL,

                Plaintiff,

     -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

                Defendant.

_____

**DECISION AND ORDER**
**No. 12-CV-6103T**

## I.   **Introduction**

Represented by counsel, William Campbell ("Plaintiff" or "Campbell"), brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  **Background and Procedural History**

On March 16, 2010, Plaintiff filed applications for SSI and DIB, claiming disability since February 9, 2009, alleging disability as a result of degenerative disc disease of the lumbar spine, bilateral osteoarthritis of the knees, and diabetes mellitus. Campbell's claim was denied on or about May 18, 2010.

Tr. 74-75.  An administrative hearing was conducted on June 27, 2011, with Administrative Law Judge ("ALJ") Milagros Farnes, presiding via video conference.  Tr. 46-73.  Plaintiff, who was represented by attorney Mark M. McDonald, testified at the hearing, as did vocational expert Mary Beth Kolkard ("Kolkard" or "VE").

On July 28, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  Tr. 26-36.  Plaintiff requested review of the hearing decision (Tr. 6), and, on January 9, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 2-5.  This action followed.

## III. Plaintiff's Medical History

### (A)  Treating Sources

Plaintiff was seen by Dr. Stephen Lasser ("Dr. Lasser") on December 23, 2009 for "chronic low back pain" that "radiat[ed] down both [his] legs, right worse than left."  Tr. 234-245.  Plaintiff also complained of numbness and tingling in his legs.  Id. at 234.  Upon examination, "[Plaintiff] ha[d] no increased pain with Valsalva maneuvers," as well as no bladder or bowel discomfort and no tenderness in his back.  Plaintiff had forward flexion to 90 degrees, extension to 30 degrees, and lateral flexion to 30 degrees.  Plaintiff's neurological examination, his reflexes, his strength, and his sensation were equal in both lower extremities.  Plaintiff's straight leg raises were negative.  Id.  Based on his

high blood sugar, Plaintiff was determined not to be a candidate for surgery.  Id. at 235.  At this time, Dr. Lasser also discussed with Plaintiff the importance of Plaintiff stopping smoking.  Id.

Dr. Lasser also reviewed a magnetic resonance imaging study (MRI) from October 23, 2009, which showed "evidence of degenerative disc disease at the L5-S1 level with a small right paracentral disk protrusion and annular tear."  Id. at 234.  The MRI also showed that there was mild foraminal stenosis irritating the right L5 nerve root.  Id.  Dr. Lasser diagnosed Plaintiff with degenerative lumbar disease at L5-S1 with foraminal stenosis and right-side sciatica.  Id.  Dr. Lasser asserted that Plaintiff was temporarily totally disabled.  Id. at 235.

On March 8, 2011, Dr. Lasser completed a residual functional capacity questionnaire ("RFCQ").  Id. at 366-369.  Dr. Lasser diagnosed Plaintiff with "lumbar degenerative disc disease L5-S1," and stated that his prognosis was "poor."  Id. at 366.  On the RFCQ, Dr. Lasser indicated that Plaintiff had tenderness, as well as various limitations in his lumbar spine range of motion.  Id. Dr. Lasser opined that Plaintiff's impairments were expected to last for at least twelve months.  Id. at 367.  Dr. Lasser estimated that Plaintiff's pain would "frequently" interfere with his attention and concentration needed to perform even simple work tasks.  Id.  According to Dr. Lasser, if Plaintiff was placed in a competitive work situation, he would need to be able to sit or

stand at will, and would need to take 15 minute breaks every hour "or more" during an 8-hour workday.  Id.

Also on the RFCQ, Dr. Lasser indicated that Plaintiff could occasionally lift 10 pounds and could rarely lift 20 pounds.  Id. at 368.  Plaintiff could "occasionally" stand, walk, and sit, could rarely stoop, crouch/squat, and climb ladders and stairs, and could never twist.  Id.  Dr. Lasser predicted that Plaintiff would have good and bad days, and would need to be absent from work about four days per month.  Dr. Lasser also imposed a 10 pound lifting restriction, as well as noting Plaintiff should avoid bending and twisting.  Id.

Dr. Lasser examined Plaintiff the same day he completed his RFCQ.  Id. at 375.  Plaintiff's back was tender, mostly around the lumbosacral junction.  A straight leg raise test was negative, and Plaintiff had no muscular atrophy.  Plaintiff's lumbar range of motion was limited.  Dr. Lasser opined that Plaintiff's limitations "probably would prevent him from working with his work history and work training."  Id.

On April 12, 2011, Dr. Lasser saw Plaintiff for an MRI follow-up visit.  Id. at 376.  The MRI showed "only mild degenerative changes at L5-S1," and "[n]o neurocompressive lesion or significant stenosis," and "no disc space narrowing or collapse."  Dr. Lasser noted that Plaintiff's spine was in "good alignment" and that there was "no sign of instability."  Id.  Dr. Lasser diagnosed Plaintiff

with "chronic muscular ligamentous back pain with mild lumbar disc disease at L5-S1." Id. Dr. Lasser offered no assessment with respect to whether Plaintiff was disabled. Id. On April 27, 2009, Plaintiff began treatment with Donald Session ("Session"), a registered physician's assistant. Plaintiff had stopped taking all of his diabetic medication, indicating to Session that he did not feel well when he took it. At that time, Plaintiff denied a history of chills, fever, shortness of breath, chest, back or abdominal pain. Id. at 260. Session assessed that Plaintiff had hyperlipidemia and diabetes. Id. At subsequent visits in May through August, Plaintiff either denied back pain or did not complain about it. Id. 253, 255, 256, 258. At these visits, Plaintiff's glucose was elevated, and Session began prescribing increasing doses of Glucotrol-XL and Glucophage XR. After reviewing laboratory results on May 5, 2009, Session assessed that Plaintiff had hypothyroidism. Id. at 258-259.

On September 1, 2009, during a visit with Session, Plaintiff complained about back pain that radiated to his legs. Id. at 252. Plaintiff denied recent trauma to the area and indicated that his current medication was not giving him any relief from his pain. Upon physical examination, Session determined that Plaintiff had tenderness in the lumbosacral region, radiating to the buttocks. Plaintiff also had tenderness in the lateral back region, and tenderness on forward flexion and back extension. A straight leg

raise test was "about 45 degrees" on both sides.  Plaintiff's gait was normal.  Session prescribed Darvocet, and instructed Petitioner to continue to apply heat and ice therapy locally to the area.  Id. at 252.  An x-ray of Plaintiff's lumbosacral spine, hips and pelvis taken the same day was determined to be normal.  Id. at 263.

At a follow-up visit on September 15, 2009 with Session, Plaintiff reported that the Darvocet was helping his pain.  Id. at 250.  Plaintiff's lumbar spine tenderness was unchanged, and a straight leg raise test was normal.  Plaintiff could walk on heels and toes, and his gait was normal.  Id. When Plaintiff saw Session again on October 2, 2009, he reported that physical therapy was helping his pain.  He had no tenderness on back extension, some tenderness on forward flexion, and continued tenderness of the lumbar spine in the lateral back region at the level of the lumbar dorsalis.  Id. at 249.

On October 20, 2009, Plaintiff met with Session again. Plaintiff reported having completed physical therapy and was supposed to continue his exercises at home.  Plaintiff's back pain had decreased and his range of motion in the lumbar area had increased.  Plaintiff's glucose was elevated.  Session encouraged Plaintiff to better monitor his diet, and also to keep beer consumption to a minimum level to help control his weight.  Id. at 247-248.

On October 23, 2009, Plaintiff had another MRI taken of his lumbar spine, which showed right paracentral disc protrusion and an annular tear at the L5-S1 level, narrowing the right lateral recess and compressing the exiting right L5 nerve root, which appeared to be mildly swollen.  Id. at 262.

On October 28, 2009 at his next appointment with Session, Plaintiff noted he had occasional back pain.  Upon physical examination, Session noted that Plaintiff's straight leg raises were done normally on both sides, that he was able to toe and heel walk, and found no tenderness on back extension.  Session noted some tenderness on forward flexion but no tenderness with lateral bending.  Plaintiff's gait was normal.  Id. at 245.  On November 18, 2009, Plaintiff met with Session again, at which time he had similar complaints, but exhibited tenderness only on forward flexion.  Id. at 244.

On January 6, 2010, Plaintiff informed Session that he had seen an orthopaedic surgeon, who declined to treat him because his glucose was too high.  Plaintiff had no back tenderness, and a straight leg test was normal.  Session increased Plaintiff's Glucophage XR dosage, and noted that his hypothyroidism and dyslipidemia were both under good control.  Id. at 242.

On January 20, 2010, Plaintiff met with Session again, at which time Plaintiff reported that his low back pain had decreased

in intensity.  Id. at 240.  Session recommended Plaintiff stop
smoking, which Plaintiff declined to do.  Id. at 241.

On March 3, 2010, Plaintiff told Session that he felt well.
Id. at 238.  His diabetes was uncontrolled, and Session took him
off Glucotrol XL and replaced it with Januvia.  Plaintiff again
complained of increased lower back pain, but Session did not test
this, and recommended Plaintiff treat it with over the counter
painkillers.  Session encouraged Plaintiff to stop smoking and to
decrease his alcohol consumption.  Id. at 238-239.

On April 14, 2010, Plaintiff saw Session again, and Plaintiff
reported that his blood sugar was high.  Session assessed that
Plaintiff's diabetes was uncontrolled.  Id. at 236.  Plaintiff's
motor strength was full throughout, and his deep tendon reflexes
were 2+ and symmetric.  Plaintiff's gait was normal.  Id.  Session
increased Plaintiff's Glucophage XR dosage, and again counseled
Plaintiff to stop smoking, which Plaintiff declined to do.  Session
noted that Plaintiff's dyslipidemia and hypothyroidism were under
good control.  Id. at 236-237.

On April 28, 2010, Plaintiff met with Session and complained
of increased blood sugar levels.  Id. at 318.  To address this,
Session rebalanced Plaintiff's Glucaphage XR dosage, continued him
on Januvia, and added Actos.  Id. at 318-319.  Plaintiff maintained
that his low back pain had increased in intensity, and Session
advised him to continue to use over-the-counter medication and heat

therapy.  <u>Id.</u> at 319.  Plaintiff's gait was normal and his motor strength was full throughout.  <u>Id.</u> at 318.  Session "strongly encouraged" Plaintiff to stop smoking, and also encouraged him to decrease his drinking.  Plaintiff's dyslipidemia and hypothyroidism continued to be well-controlled.  <u>Id.</u> at 319.  Subsequent visits on May 26, June 9, and September 14 showed no significant changes in Plaintiff's health.  Plaintiff's diabetes remained uncontrolled, and he continued complaints of low back pain for which Session referred him to a pain management clinic.  <u>Id.</u> at 320-323, 339-340.

On October 15, 2010, Plaintiff met with Session.  <u>Id.</u> at 342.  Plaintiff denied any complaints and stated that he felt well.  <u>Id.</u> at 342.  During visits with Session on October 26 and November 9, Plaintiff denied back pain.  <u>Id.</u> at 344-347.  On November 29, 2010, Plaintiff met with Session "for a physical for his disability claim" and to have disability forms filled out.  <u>Id.</u> at 348-350.  At that time, Plaintiff complained of low back pain with intermittent sciatica, with pain radiating down both his legs, right worse than left.  He also complained of numbness and tingling in his legs.  <u>Id.</u> at 348.

Upon Session's physical examination of Plaintiff, his straight leg raise tests were normal on both sides.  There was some tenderness to palpation over Plaintiff's lower lumbar spine, as well as on extension, flexion, lateral rotation, and lateral bending.  Plaintiff could walk heel-to-toe without difficulty.  His

motor strength was full throughout, and his gait was unremarkable. Session reviewed the MRI findings from October 2009, and his "final impression" was degenerative lumbar disc disease at L5-S1 with foraminal stenosis and right-side sciatica, and chronic low back pain with right and left side radiculopathy. Plaintiff was referred to a neurosurgeon for further evaluation. At this time, he was receiving epidural cortisone injections. Id. at 349.

On December 6, 2010, Session completed a RFCQ. Id. at 335-338. Session assessed that Plaintiff had tenderness and muscle spasm, and had range of motion limitations on extensions and flexion of his lumbar spine. Id. at 335. Session estimated Plaintiff's impairment would last for at least twelve months, and also stated that Plaintiff had depression. According to Session, Plaintiff's pain would "occasionally" interfere with his attention and concentration. Session opined Plaintiff would need a job where he could sit and stand at will, and would need to "frequently" take unscheduled 20 minute breaks, during which he would need to lie down. Id. at 336-337. Plaintiff could "frequently" lift less than 10 pounds, and could "occasionally" lift 10 pounds, but could "never" lift more than 20 pounds. Plaintiff could "frequently" stand and walk, could "occasionally" sit, twist, stoop, and climb stairs, could "rarely" crouch/squat, and could "never" climb ladders. Sessions opined that Plaintiff would be absent from work about four days per month, and there were no restrictions on the

number of hours or days Plaintiff could be present at work.  Id. at 337.

At a visit on December 17, 2010, Session examined Plaintiff and found no neurological abnormalities.  Id. at 359-360.  On Janauary 27, 2011, Plaintiff met with Session and reported that his sugars were between 126 and 180, and that he was experiencing vomiting and diarrhea.  Session diagnosed Plaintiff with gastreoenteritis and prescribed a clear liquid diet.  Id. at 361-362.  On February 11, 2011, Plaintiff met with Session and complained of "occasional" back pain.  Laboratory tests shows that Plaintiff's hemoglobin A1C was elevated.  Id. at 363-364.  Plaintiff told Session that he was not following his diet and was not as active as he had been.  On examination of Plaintiff's back, Session detected some tenderness over the lower lumbar spine, and tenderness with extension, flexion, lateral rotation, and bending.  Id. at 363.

On March 18, 2011, Plaintiff told Session that he had been prescribed Kadian, which was helping to relieve his lower back pain more than the injections.  Id. at 381-382.  Session noted that there was some tenderness to palpation over Plaintiff's lower lumbar spine.  Session noted that Plaintiff continued to smoke, despite being counseled on smoking cessation.  Id. at 382.

On April 14, 2011, Plaintiff told Session that he had met with Dr. Lasser, who determined that Plaintiff's back condition did not

warrant surgery.  Id. at 383.  At that time, Plaintiff continued to complain of chronic low back pain.  Id.  Plaintiff's dyslipidemia and hypothyroidism continued to be well-controlled.  Id. at 384.

On August 23, 2010, Plaintiff began seeing Dr. Ashraf Sabahat ("Dr. Sabahat") for his back pain.  Id. at 329-331.  Plaintiff claimed that he experienced pain in his middle and lower back, as well as pain in  both knees and pain in the thoracic region.  Id. at 329.  Plaintiff reported that standing, sitting on a hard chair, and walking aggravated the pain.  Plaintiff told Dr. Sabahat that physical therapy had not helped.  Id.

Dr. Sabahat's physical examination of Plaintiff showed tenderness on palpation of Plaintiff's lower back, as well as with deep palpation over his bilateral sacroiliac joints.  Id. at 330.  On deep palpation, Dr. Sabahat detected tenderness over Plaintiff's lower cervical and upper thoracic spines.  A straight leg raise test was negative.  Plaintiff had normal range of motion in his shoulders and neck.  Dr. Sabahat reviewed Plaintiff's October 2009 MRI, and treated Plaintiff with epidural steroid injections and Naprelan.  Id. at 331.

On October 20, 2010, Plaintiff returned to see Dr. Sabahat. He received an injection on his right sacroiliac joint.  Id. 331. Plaintiff treated his pain with Naprelan once a day and Tylenol as needed.  Id. at 332.

On November 22, 2010, Plaintiff again visited Dr. Sabahat and reported his sacroiliac pain had been resolved by the injections. Plaintiff did not report any meaningful improvement with the back injections, and Dr. Sabahat's physical examination did not show any changes from Plaintiff's last visit. Dr. Sabahat gave Plaintiff an epidural steroid injection in his lumbar back on December 14, 2010. Id. at 333.

On January 17, 2011, Plaintiff met with Dr. Sabahat and told him that the injection did not relieve his pain. He reported that he consulted a neurosurgeon, who declined to offer surgical intervention. Plaintiff continued to have tenderness on deep palpation of his lower back, with negative straight leg raise tests, and no muscle weakness. Id. at 353.

On March 7, 2011, Dr. Sahabat administered transforminal epidural injections at L5-S1 on both sides. Id. at 386. At a follow-up visit on March 16, 2011, Plaintiff felt he did not have significant improvement with these injections, and instead was pursuing surgical intervention. Dr. Sabahat increased Plaintiff's Kadian dosage to help him manage his back pain. Id. at 387. On March 23, 2011, Plaintiff met with Dr. Sabahat and reported that he did not feel a significant improvement in his condition since his last two visits. Id. at 388. Dr. Sabahat continued Plaintiff on Kadian, and prescribed Flexeril. Id. at 388.

-13-

On April 18, 2011, Plaintiff met with Dr. Sabahat and reported that the combination of Kadian and Flexeril allowed him to manage his pain.  Id. at 389.  Plaintiff reported he was doing well overall and was able to do his everyday activities better than before.  Upon physical examination, Dr. Sabahat detected tenderness with deep palpation of Plaintiff's lumber spinous process, and his bilateral sacroiliac joints.  Straight leg tests continued to be negative.  Plaintiff had no weakness in any leg muscles, and had no neurological deficits.  Id.

### (B)   Consultative Examinations

On May 10, 2010, Plaintiff saw Dr. Karl Eurenius ("Dr. Eurenius") for an orthopedic consultative examination.  Id. at 293-296.  Plaintiff complained that he experienced back pain, had arthritis in his knees, and a recent onset of diabetes.  He complained that his back pain had worsened over the previous two years.  Plaintiff reported that he was diagnosed with diabetes in 2008.  Plaintiff also indicated that he had seen an orthopedic surgeon who told him he needed surgery, but could not have surgery until his diabetes is under better control.  Plaintiff complained that he ought to go to a pain clinic, but could not be referred to one until his diabetes was under better control.  Plaintiff also reported a history of hypothyroidism and high cholesterol, both controlled with medication.  Id. at 293.

-14-

At the time of the consultative examination, Plaintiff was taking Januvia, Actos, Pravastatin, Levothyroxine, and Metformin. Id. at 294.  He smoked one pack of cigarettes per day, and drank approximately twelve beers a week.  Plaintiff reported cooking, cleaning, doing laundry, shopping and childcare.  He showered and dressed himself, watched television, listened to the radio, and socialized with friends.  Id. at 294.

Dr. Eurenius observed that Plaintiff's gait appeared "somewhat slow."  Id. at 294.  He could stand on his heels and toes, and could squat to one-quarter with pain in his low mid-back.  He used no assistive device.  Plaintiff did not need help changing for the examination, getting on or off the examination table, and could rise from a chair with some pain.  Id.  Dr. Eurenius assessed that Plaintiff's hand and finger dexterity were intact, and his grip strength was full on both sides.  Id. at 295.  Plaintiff had full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally of his cervical spine, with no pain or spasm. Id.  With respect to his upper extremities, Plaintiff had full range of motion of his arms and shoulders, with the exception of an inability to elevate his arms above approximately 120 degrees due to a "pulling" feeling in his lower back.  Plaintiff had no joint inflammation, effusion, or instability, with full strength in his proximal and distal muscles.  He had no muscle atrophy and no sensory abnormality.  Id.  With respect to his thoracic and lumbar

spines, Plaintiff had some limits on his range of motion.  Id.  He had spasm and tenderness on palpation.  Plaintiff had full lateral flexion and rotation, with pain at the end of those maneuvers.  He had no scoliosis or kyphosis.  A straight leg test caused pain in the low mid back, posterior thighs, and buttocks on both sides.  Dr. Eurenius also reviewed a lumbosacral x-ray that was negative.  Id. at 295-297.  Plaintiff had full passive range of motion in his hips, knees, and ankles, with full strength in his lower extremities.  He had no atrophy, no sensory abnormalities, and his reflects were physiologic and equal.  Plaintiff had no joint effusion, inflammation or instability.  Id. at 295.  Dr. Eurenius assessed that Plaintiff was moderately limited in prolonged sitting, prolonged standing, walking more than a city block, climbing or descending more than a flight of stairs, and lifting or carrying more than 10 pounds due to chronic back pain with neuropathic symptoms.  Id. at 295.

**(C)  Other Evidence**

**1.  Plaintiff's Testimony**

Plaintiff testified that, at the time of the hearing in 2011, he was 39 years old.  Id. at 39.  His most recent job was detailing and cleaning cars for a car dealership.  Id. at 52.  Plaintiff stopped working in February 2009 because his knees kept giving out when he walked, and then because he "ripped a disc" in his back.  Id. at 52, 55-56.

Plaintiff testified that, prior to February 2009, he worked at another car dealership detailing cars.  Id. at 53-54.  Plaintiff also worked at Cole Muffler, installing exhaust systems and putting in hitches, lifting up to 80 pounds at a time.  Plaintiff was on his feet all day, and this work involved a lot of reaching above his head.  Id. at 54.  Plaintiff testified that he also worked for a carnival, setting up and tearing down rides, and swinging a hammer to ring a bell.  Id. at 54-55.

Plaintiff testified that he lived in a friend's camper.  Id. at 55.  Plaintiff stopped drinking in April of 2011, but continued to smoke.  Id. at 59.  He had trouble concentrating, especially when taking medication.  Id. at 60.  Plaintiff testified that he had "major sharp pains" in his right hip that ran down his leg. Id. at 56.  Walking or standing for too long caused similar pain in his left leg.  He also testified that he could not lift anything. According to Plaintiff, if he stood or walked too long, his right leg went numb.  Id.  Plaintiff testified that the medication he took for the pain made him "real tired" and dizzy.  Id. at 57. Plaintiff testified that he had very little energy because of his pain medication, and sometimes could not get out of bed because of the pain.  Id. at 57-58.

Plaintiff testified that he had difficulty walking for longer than 10 to 15 minutes.  Id. at 59.  He had problems walking on uneven ground and climbing stairs.  Id. at 60.  He had to switch

between sitting and standing, and testified that he could sit for between a half hour and a couple hours, depending on the day.  He testified that he could only lift 10 to 15 pounds.  Id. at 60. Plaintiff testified that his diabetes was under control, and that stress was causing the problem.  Id. at 60-61.  Plaintiff testified further that he spent time with friends, helping them out, and watched television.  Id. at 61.  Plaintiff had a car and could drive.  Id. at 61.  Plaintiff cleaned his living space, did dishes, and did laundry.  Id. 62.  He claimed that if he used his hands too much they would go numb.  Id.

### 2.   Testimony of the VE

VE Mary Beth Kolkard testified at the hearing.  Id. at 63-72. She classified Plaintiff's previous work as unskilled to semi-skilled, either heavy or medium exertion.  Id. at 63-64.  The ALJ asked Kolkard to assume a hypothetical individual of the same age, education, and vocational profile as Plaintiff, who was limited to light work with a sit-stand option, and no climbing stairs.  Id. at 64.  When asked by the ALJ asked if such an individual could perform Plaintiff's previous work, Kolkard testified that such a person would not be able to perform any of Plaintiff's past relevant work.  Kolkard testified, however, that such an individual could perform other work in the national economy, such as ticket seller, toll collector, and order caller.  Id.

The ALJ then changed the hypothetical, limiting the individual to sedentary exertion. Id. at 65. Kolkard testified that such a person could not perform Plaintiff's past work, but could perform other work in the national economy, such as surveillance systems monitor, order clerk, and assembler. Id. at 66. Kolkard testified that her testimony was consistent with the Dictionary of Occupational Titles. Id. at 72.

## IV. Discussion

### 1. Jurisdiction and Scope of Review

42 U.S.C. §405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. When considering these cases, this section directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938). The Court's scope of review is limited to whether or not the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. See Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that a reviewing Court does not try a benefits case de novo). The Court must "scrutinize the record in its entirety to determine the

reasonableness of the decision reached." <u>Lynn v. Schweiker</u>, 565 F.Supp. 265, 267 (S.D. Tex. 1983) (citation omitted).

In this case, the parties dispute whether the ALJ's decision is supported by substantial evidence and have moved for judgment on the pleadings pursuant to Rule 12(c). Judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that plaintiff has not set forth a plausible claim for relief, judgment on the pleadings may be appropriate. <u>See</u> <u>generally</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007).

**2.    There is Substantial Evidence in the Record to Support the ALJ's Decision that Plaintiff was not Disabled Within the Meaning of the Act**

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims.[1] Tr. 26-36. Under step 1 of the process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability

---

[1]
    The five-step analysis requires the ALJ to consider the following:  (1) whether the claimant is currently engaged in substantial gainful activity;  (2) if not, whether the claimant has a severe impairment which significantly limits his or her physical or mental ability to do basic work activities;  (3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled;  (4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work;  (5) if the claimant's impairments prevent his or her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity and vocational factors, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

(February 9, 2009).  Id. at 28.  At steps 2 and 3, the ALJ
concluded that Plaintiff has the severe impairments of degenerative
disc disease of the lumbar spine with disc protrusion, diabetes
mellitus, and osteoarthritis of the knees, bilaterally, but that
the plaintiff does not have an impairment or combination of
impairments that meets or medically equals one of the listed
impairments.  The ALJ also determined that Plaintiff suffered from
alcohol abuse, hyperthyroidism, and tobacco abuse, but that these
did not constitute severe impairments insofar as "treatment notes
show that the condition is well controlled with medication, and
does not cause more than a minimal limitation in his ability to
perform work related activities."  Id. at 28-29.  At steps 4 and 5,
the ALJ concluded that Plaintiff has the residual functional
capacity ("RFC") to perform sedentary work except he is limited to
work that requires no climbing of stairs and allows for him to
alternate between sitting and standing positions throughout the
day.  Id. at 29-35.  Moreover, the ALJ found that Plaintiff was
unable to perform any past relevant work, but that considering the
Plaintiff's age, education, work experience, and RFC, there are
jobs that exist in significant numbers in the national economy that
Plaintiff can perform.  Id. at 35-36.

Plaintiff argues that the ALJ's finding that he could do a
limited range of sedentary work, is capable of performing a
significant number of jobs in the national economy and therefore is

not disabled, is not supported by the substantial evidence of record and is based upon the ALJ's failure to apply the proper legal standards.  <u>See</u> Pltf's Mem. of Law at p 1 (Dkt. No. 5-2). Specifically, Plaintiff maintains that the Commissioner erred by: (1) improperly rejecting the opinions of the treating physician (Dr. Lasser) and physician's assistant[2] (RPA Session); (2) improperly assessing the plaintiff's residual functional capacity ("RFC"); (3) relying upon the testimony of the VE which does not provide substantial evidence to support the Commissioner's decision; and (4) improperly rejecting the plaintiff's credibility. <u>Id.</u>

Based on the entire record, the Court finds that the ALJ properly concluded that Plaintiff was not disabled within the meaning of the Act.  The Court now addresses each of Plaintiff's contentions.

### (A)   The ALJ Gave Proper Weight to the Medical Opinions in the Record

Plaintiff claims that the ALJ failed to properly weigh the opinions of treating physician Dr. Lasser and physician assistant Session when determining Plaintiff's RFC.  <u>See</u> Pltf's Mem. of Law

---

[2]

In his pleadings, Plaintiff refers to Session as a "nurse practitioner." <u>See</u> Pltf's Mem. of Law at Point I.  Defendant refers to Session as a "physician's assistant" in its pleadings.  <u>See</u> Def's Mem. of Law at p 4.  Based on the record before this Court in which Session is consistently referred to with the letters "RPA-C" following his name, he appears to be in fact a physician's assistant and not a nurse practitioner.  The distinction is not relevant to the Court's analysis of this particular issue (<u>see</u> discussion <i>infra</i>).  Nonetheless, because Session appears to be a physician's assistant, the Court refers to him as such throughout the instant decision.

at Point I.   The ALJ afforded the opinion of Dr. Lasser "some weight, but neither controlling nor significant weight[,]" and afforded the statements and opinions of RPA Session, "probative weight."  Tr. 34.

As an initial matter, the regulations provide that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s). . . ."   20 C.F.R. § 404.1527(a)(2).   The regulations also permit consideration of opinions by "other sources" to "show the severity of [the claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 404.1513(d).  For purposes of the Act, "other sources" include medical sources not listed as "acceptable medical sources," such as nurse-practitioners, physicians' assistants, and therapists.   20 C.F.R. § 404.1513(d)(1);   see also Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) ("[N]urse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight.") (citation omitted).  Opinions from "other sources" "do not demand the same deference as those of a treating physician[,]" Genier, 298 F. App'x at 108, but the ALJ certainly "has the discretion to determine the appropriate weight

to accord the [other source]'s opinion based on all the evidence before him[.]" Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995).

Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). The ALJ may refuse to consider the treating physician's opinion controlling only if he is able to set forth good reason for doing so. Saxon v. Astrue, 781 F. Supp.2d 92, 102 (N.D.N.Y. 2011) (citing 20 C.F.R. § 404.1527(d); other citation omitted).

Where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts, it is not afforded controlling weight. Williams v. Commissioner of Social Sec., 236 F. App'x 641, 643-44 (2d Cir. 2007); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)); Otts v. Commissioner of Social Sec., 249 Fed. Appx. 887, 889, 2007 WL 2914449, at *2 (2d Cir. Oct. 5, 2007) (unpublished opn) ("An ALJ . . . may also reject such an opinion [from a treating source] upon the identification of good reasons, such as substantial contradictory evidence in the record.") (citation omitted). When a treating physician's opinions are inconsistent with even his own treatment notes, an ALJ may

properly discount those opinions.  See Halloran v. Barnhart, 362
F.3d 28, 32 (2d Cir. 2004).  "Although the final responsibility for
deciding issues relating to disability is reserved to the
Commissioner, see 20 C.F.R. § 404.1527(e)(1), an ALJ must give
controlling weight to a treating physician's opinion on the nature
and severity of the claimant's impairment when the opinion is
well-supported by medical findings and not inconsistent with other
substantial evidence, id. § 404.1527(d)(2)."  Martin v. Astrue, 337
F. App'x 87, 89 (2d Cir. 2009) (unpublished opn.).

In this case, as the ALJ observed, Dr. Lasser's statements in
his RFCQ were not entirely consistent with his own findings
throughout the record.  Tr. 34.  For example, when Dr. Lasser
performed a physical examination of Plaintiff in December of 2009,
he found that Plaintiff's back "revealed no tenderness" and his
"neurological exam, reflexes, strength and sensation" were "equal
in both lower extremities" and his straight leg raises were
negative.  Tr. 235.  However, the next time Dr. Lasser met with
Plaintiff in March of 2011, he opined that Plaintiff suffered from
various functional limitations, namely that he could only
"occasionally" walk, stand and sit, could "never" twist, and could
"rarely" stoop, crouch/squat, and climb ladders and stairs.  Id.
Moreover, on March 8, 2011, the same day Dr. Lasser completed his
functional capacity assessment indicating Plaintiff suffered from
various functional limitations, he also noted that Plaintiff's

straight leg test was negative and that he had no muscular atrophy. Tr. 375.

Additionally, as the ALJ observed, Dr. Lasser's opinion with respect to Plaintiff's limitations on the RFCQ were not entirely consistent with the findings of other physicians in the record, such as Dr. Eurenius (see discussion of assessment *infra*).  Tr. 34.

With respect to Dr. Lasser's opinions in January 2010 that Plaintiff was "temporary totally disabl[ed]" (Tr. 31) and in March 2011 that Plaintiff was "marked partial disab[led]," I find that the ALJ was correct in noting that the ultimate issue of Plaintiff's legal disability is an issue reserved for the Commissioner.  Tr. 34;  see Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999)(finding that whether a claimant is disabled is reserved to the Commissioner); SSR 96-5p (stating that the responsibility for deciding whether an individual is disabled under the Social Security Act is reserved to the Commissioner).

Plaintiff also argues that the ALJ failed to properly weigh the opinion of RPA Session.  Specifically, Plaintiff claims that RPA Session qualifies as a "medical source" and thus the ALJ was required to apply the Commissioner's factors in weighing his opinion.

Contrary to Plaintiff's contention, Session, as a physician's assistant, qualifies as an "other source" under the regulations. As the ALJ noted, RPA Session is not a medical doctor and his statements and opinions were therefore not entitled to controlling

weight.  Rather, to the extent they were "somewhat consistent with the record," the ALJ appropriately assessed his statements and opinions for their "probative value."  Tr. 34.  As the ALJ noted, Session's opinions were not consistent with the objective findings in the record.  <u>Id.</u>  For example, although Session opined on the functional assessment questionnaire that Plaintiff suffered various functional limitations (<u>Id.</u>), Session noted at a physical examination the same month that Plaintiff "states he feels well" and "notes occasional back pain."  Tr. 363.  Additionally, at that time, Session noted that Plaintiff's gait was unremarkable.  <u>Id.</u> Moreover, the record evidence reflects that when Plaintiff complied with his physical therapy treatments, "he had an increase in range of motion in the lumbar region" and "some" decrease in pain.  Tr. 247.

Accordingly, the Court finds that the ALJ did not err in evaluating the medical opinions in the record.  Insofar as there was evidence in the record inconsistent with the opinions of Dr. Lasser and RPA Session, the ALJ was entitled to give their respective opinions less than controlling weight.  Additionally, the Court finds that the ALJ did not err in weighing the opinions of Dr. Lasser and RPA Session, in assigning them, respectively, "some weight" and "probative weight."  Tr. 34.

**(B)  The ALJ Properly Assessed Plaintiff's RFC**

Plaintiff claims that ALJ improperly assessed Plaintiff's RFC. <u>See</u> Pltf's Mem. of Law at Point II.  After considering the entire

record, the ALJ found that Plaintiff retained the residual functional capacity for sedentary work as defined by 20 C.F.R. §§ 416.967(a) and 416.967(a); Tr. 29-34. However, the ALJ found that due to his impairments, Plaintiff "is limited to work that requires no climbing of stairs and allows for the [Plaintiff] to alternate between sitting and standing positions throughout the day." Tr. 29. I find that the ALJ properly assessed Plaintiff's RFC, and there is substantial evidence to support her finding.

As an initial matter, a report of a consultative physician may constitute substantial evidence in support of an ALJ's opinion. Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). In this case, the opinion of Dr. Eurenius supports the ALJ's finding with respect to Plaintiff's ability to perform sedentary work.

On May 5, 2010, Dr. Eurenius, the Administration's consultative physician, found that Plaintiff was "moderately limited in prolonged sitting, prolonged standing, walking more than a city block, climbing or descending more than a flights [sic] of stairs, lifting or carrying more than ten pounds due to chronic back pain with neuropathic symptoms." Tr. 296. On physical examination, Dr. Eurenius found that Plaintiff "appeared to be in no acute distress." He observed that Plaintiff's gait was "somewhat slow," but that he could stand on his heels and toes. He assessed that Plaintiff could squat a quarter way with pain in the low mid back. Id. Additionally, Dr. Eurenius noted that Plaintiff "[used] no assistive device" and "needed no help changing for the

exam or getting on and off [the] exam table and can rise from chair, although it was clear that this was painful for him." Id. At this time, Dr. Eurenius also found that Plaintiff's hand and finger dexterity was intact and he had full grip strength in both hands. Plaintiff had full flexion and extension, lateral flexion bilaterally, and rotary movements bilaterally with respect to his cervical spine. Dr. Eurenius found no cervical or paracervical pain or spasm and no trigger points. Id. at 295.

With respect to Plaintiff's upper extremities, Dr. Eurenius found that Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, and fingers bilaterally. Although Plaintiff was unable to elevate his arms above approximately 120 degrees "due to a pulling feeling in his lower back[,]" he had no joint inflammation, effusion, or instability. Plaintiff's strength was full in his proximal and distal muscles. Dr. Eurenius found no muscle atrophy, no sensory abnormality, and Plaintiff's reflexes were physiologic and equal. With respect to Plaintiff's thoracic and lumbar spines, Plaintiff was able to flex his trunk to approximately 60 degrees with pain in the low mid back.

With respect to Plaintiff's lower extremities, Dr. Eurenius found that Plaintiff had full passive range of motion of the hips, knees, and ankles. His strength was 5/5 with no atrophy, no sensory abnormalities, no joint effusion, inflammation or instability. Plaintiff's reflexes were physiologic and equal. Id. After his examination of Plaintiff, Dr. Eurenius assigned Plaintiff

-29-

a "stable" diagnosis.  Id.  296.  As the ALJ noted, Dr. Eurenius
noted that Plaintiff's x-ray images were negative.  Id.

Accordingly, I find that the ALJ properly assessed Plaintiff's
RFC, and there is substantial evidence in the record to support the
ALJ's finding.

Plaintiff asserts further that, "[e]ven if correct, the ALJ's
RFC finding is not specific enough" insofar as said finding does
not indicate the frequency of Plaintiff's need to periodically
change positions between sitting and standing, as required by SSR
96-9p.  See Pltf's Mem. of Law at Point II.

Indeed, as Plaintiff asserts, according to Social Security
Ruling 96-9p, 1996 SSR LEXIS 6, "[t]he RFC assessment must be
specific as to the frequency of the individual's need to alternate
between sitting and standing."  SSR 96-9p, 1996 SSR LEXIS 6 at *19,
2006 WL 374185, *7 (1996).  However, the Second Circuit has stated
that "[t]he regulations do not mandate the presumption that all
sedentary jobs in the United States require the worker to sit
without moving for six hours, trapped like a seat-belted passenger
in the center seat on a transcontinental flight."  Halloran v.
Barnhart, 362 F.3d 28, 33 (2d Cir. 2004).  Furthermore, the
regulations provide that "[t]here are some jobs in the national
economy . . . in which a person can sit or stand with a degree of
choice.  If an individual had such a job and is still capable of
performing it . . . he or she would not be found disabled."  SSR
83-12, 1983 SSR LEXIS 32, 1983 WL 31253, *4 (1983).

Here, the ALJ's finding that Plaintiff maintains the RFC to perform sedentary work is well supported by the record evidence. A sedentary job is one that requires sitting and occasional walking and standing.  See 20 C.F.R. § 404.1567(a).  Although the ALJ's RFC finding did not specifically state the frequency with which Plaintiff must alternate between sitting and standing in terms of hours, the ALJ did determine, in general terms, that Plaintiff must be able "to alternate between sitting and standing positions throughout the day" in order to meet the exertional requirements of sedentary work.  Tr. 29.  Based upon the substantial medical evidence in the record, the Second Circuit's interpretation of Social Security Ruling 96-9p, and the determination of the degree of flexibility with which Plaintiff needs to alternate positions, I find that the ALJ's RFC determination was consistent with the applicable legal principles.

**(C)   The ALJ Properly Evaluated Plaintiff's Credibility**

Plaintiff claims that the ALJ improperly rejected his credibility.  See Pltf's Mem. of Law at Point IV.

The credibility of witnesses, including the claimant, is primarily determined by the ALJ and not the courts.  Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1982) (citations omitted).  The Social Security regulations provide that "in determining the credibility of the individual statements, the adjudicator must consider the entire record."  SSR 96-7p, 1996 SSR LEXIS 4.  The ALJ found that Plaintiff's "statements concerning

the intensity, persistence and limiting effects of [his] symptoms [were] not credible to the extent that they [were] inconsistent with the above residual functional capacity assessment." Tr. 30. I find that the ALJ properly evaluated Plaintiff's credibility.

Here, Plaintiff's RFC was based on all the evidence in the record, including his subjective complaints, treatment history, activities of daily living, and other factors as enumerated at 20 C.F.R. § 416.929(c)(3); Tr. 29-34.

At the administrative hearing, Plaintiff testified that he stays at a friend's camper where he does cleaning and washes dishes and clothes, and watches television. Tr. 62. Additionally, he testified that he is able to drive a vehicle, and drives, on average, 30 miles a week. Id. at 61.

As the ALJ noted, Plaintiff's treatments for his back-related impairments were minimal, consisting of heat packs, over the counter medicines, physical therapy, and injection therapy. Tr. 34. Additionally, Plaintiff's two MRIs and treatment notes showed that Plaintiff suffered only from mild degenerative disc disease. Further, as the ALJ noted, Plaintiff's physical examinations, as set forth more fully above, revealed generally mild findings over the course of the record regarding range of motion, the location, intensity, and characteristics of the pain Plaintiff claimed to endure. Id.

The ALJ noted that the objective findings of Plaintiff's doctors throughout the record were not consistent with the severe

degree of limitation in Plaintiff's daily activities that Plaintiff claimed to endure.

With respect to Plaintiff's uncontrolled diabetes, the ALJ properly looked to Plaintiff's non-compliance with treatment in assessing Plaintiff's credibility.  See SSR 96-7p (a claimant's statements "may be less credible . . . if the medical reports or records show that the individual is not following the treatment prescribed . . .).  The ALJ noted that the objective medical evidence shows that Plaintiff is not compliant with medication, diet, treatment or monitoring of his diabetes.  Tr. 34.

Similarly, with respect to Plaintiff's knee impairments, the ALJ noted that the degree of limitation Plaintiff claims to suffer due to his diagnosis of bilateral knee osteoarthritis is also not entirely consistent with the degree of limitation evidenced by the record.  Notably, the worst observation by any physician of problems related to his knees was Dr. Eurenius who opined that Plaintiff's gait was "somewhat slow."  Tr. 294.

Accordingly, this Court is compelled to uphold the ALJ's decision discounting a claimant's testimony if the finding is supported by substantial evidence, as it is here.  Aponte v. Secretary of Department of Health and Human Services, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).  I find that the totality of the evidence in the record supports the ALJ's assessment of Plaintiff's credibility.

**(D)   The ALJ Did Not Err in Relying Upon the Testimony of the VE**

Plaintiff argues that the ALJ erred in relying upon the testimony of the VE insofar as the hypothetical provided to her did not include all of the limitations supported by the evidence, namely those opined by Dr. Lasser and RPA Session. See Pltf's Mem. of Law at Point III.

The Court finds that the hypothetical question posed to the vocational expert accurately reflected Plaintiff's vocational profile and RFC. In determining Plaintiff's RFC, the ALJ properly evaluated the entire record and declined to give controlling weight to the respective medical opinions of Dr. Lasser and RPA Session to the extent they were internally inconsistent and/or inconsistent with the record. Accordingly, the ALJ did not err in declining to include in her hypothetical the limitation(s) or any other limitations opined by Dr. Lasser and Session, respectively, for which she found inadequate record support. See, e.g., Priel v. Astrue, No. 10-566-cv, 453 Fed. Appx. 84, 87 (2d Cir. 2011) (finding that the ALJ properly declined to include in his hypothetical question symptoms and limitations suggested by the treating physician that both conflicted with other substantial evidence in the record and were discounted in the residual functional capacity assessment).

Because the ALJ's RFC finding was supported by substantial evidence in the record, the hypothetical posed to the vocational

expert was adequate.  Therefore, I conclude that the ALJ's decision at step 5 was proper and was supported by substantial evidence.

**V.    Conclusion**

After careful review of the entire record, and for the reasons stated, this Court finds that the Commissioner's denial of benefits was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed. For the reasons stated above, I grant Commissioner's motion for judgment on the pleadings (Dkt. No. 6).  Plaintiff's motion for judgment on the pleadings is denied (Dkt. No. 5), and Plaintiff's complaint (Dkt. No. 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    March 25, 2013
          Rochester, New York